**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:18-cv-198-FDW**


| | | |
|---|---|---|
| JAMES A. WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| BRETT SIMMONS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

      **THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment, (Doc. No. 31). Also pending is Plaintiff's Motion to Appoint Counsel, (Doc. No. 42).

## I.     BACKGROUND

      *Pro se* incarcerated Plaintiff's Complaint, (Doc. No. 1), passed initial review on claims of the use of excessive force/failure to intervene against Defendants Brett Simmons, J. Honbarrier, Kearry Hinson, and Paul Dimato, for incidents that occurred at the Lanesboro Correctional Institution on March 3, 2017. (Doc. No. 11). Defendants seek summary judgment.

**(1)**    <u>**Complaint**</u> (Doc. No. 1)

      In his unverified Complaint, Plaintiff alleges that numerous officers responded to a code for assistance, at which time Plaintiff was maced and tackled to the ground. Plaintiff was assaulted by officers while lying face-down on the ground. Defendants Dimato and Simmons beat Plaintiff in the head with their nightsticks that caused him to get 16 stitches on the top of his head. Plaintiff was secured in full restraints and escorted to a room where Defendants Hinson and Honbarrier punched and kicked him, causing a broken jaw. He seeks damages for pain and suffering.

**(2)**    <u>**Defendants' Motion for Summary Judgment**</u> (Doc. No. 31)

Plaintiff was an inmate being escorted to his cell at Lanesboro C.I. when he slipped his handcuffs, pushed the escorting officer, and ran through a restricted access doorway into a hallway. Plaintiff stood in the hallway with one hand in his pocket while several correctional officers stood by and tried to defuse the situation and get him to submit to restraints. After a significant period of time during which Plaintiff refused to obey orders, the Officer in Charge ("OIC") of the shift that day ordered the correctional officers to use pepper spray then restrain Plaintiff. Plaintiff resisted, pulled out a homemade knife out of his pocket, and began slashing officers, injuring two of them with the knife. The officers used additional force to ensure that Plaintiff did not injure another officer and to get him to release the knife. Officers were finally able to restrain Plaintiff and he was escorted to medical for evaluation and treatment. Officer statements and video footage reveal that the officers, who were faced with a dynamic and potentially violent situation in the hallway, used justified and necessary force and did not use excessive force. Plaintiff cannot forecast evidence that he was beaten and kicked after the incident in the hallway by Defendants Hinson and Honbarrier. Alternatively, because no constitutional violation has been shown, qualified immunity shields Defendants from Plaintiff's claims for monetary damages.

**(3)** **Plaintiff's Response** (Doc. No. 43)

In his verified Response, Plaintiff admits assaulting Hinson at around 2:45 PM. Plaintiff was "maliciously beaten" by Defendant Simmons and other officers after Plaintiff was subdued and after the assaultive behavior had clearly passed until Plaintiff was "broken, bleeding, and unconscious while still handcuffed." (Doc. No. 43 at 2). There is no way that Plaintiff was a threat where 12 officers were involved. While Plaintiff was on his stomach, unconscious due to the malicious blows to his head, officers put their feet on the subdued Plaintiff and Defendant Simmons stated "you done fucked up." (Doc. No. 43 at 2). Plaintiff was handcuffed behind his

back when Defendants used excessive force with wanton and malicious intent to cause pain and suffering as punishment for Plaintiff's past actions. The use of fists, feet, and batons was not necessary or justified.

After the incident in the hallway, while Plaintiff was being escorted to the interview room to be placed in a holding cage, Honbarrier and Hinson punched and kicked him, causing a broken jaw as payback for the altercation with Hinson. Plaintiff was escorted compliantly off the hallway then was pushed into an interview room and placed into a cage where he was assaulted more by Honbarrier and Hinson off-camera with the intent and malicious goal of hurting, not subduing, Plaintiff. There is a gap in the video footage when Plaintiff is being escorted to the interview room when he was beaten with fists and feet. <u>See</u> (Doc. No. 43 at 53). Plaintiff fell to the floor after the first blows and was beaten while handcuffed.

At the nurse station, Plaintiff was observed to have blood coming from his forehead and the top of his head, four 4-6 cm lacerations on the top of his scalp, and a fractured jaw on the left side due to officer force. Plaintiff was sent to outside medical then to Central Prison for urgent care. Defendants do no explain the more severe injuries on the top of Plaintiff's head and face. Plaintiff was hospitalized for Defendants' actions and was handcuffed the entire time. Staff did not truthfully and fully describe the events they witnessed in the use of force on March 3, 2017 and there are obvious contradictions between Simmons' defense and the five officer statements. Officers are attempting to cover up other officers' use of excessive force. Simmons is inconsistent about the areas of Plaintiff's body that he struck.

Although no officer followed policy and the law to report this truthfully, in the officer statements, they do not deny this was done. Additional surveillance cameras and handheld cameras during uses of force are needed.

Defendants are not entitled to qualified immunity because a reasonable officer would have known that the conduct violated his constitutional rights.

Plaintiff seeks punitive and compensatory damages and declaratory judgment.

**(4)      Defendants' Reply** (Doc. No. 44)

Defendants argue that Plaintiff's Response does not add anything besides what is contained in the Complaint and does not demonstrate that summary judgment should not be granted for Defendants. The video camera footage shows the reasonableness of officers' actions in trying to get Plaintiff to cooperate. When he refused, the OIC was gotten and the use of force became necessary. Pepper spray and hands-on force were used. Once Plaintiff pulled out a weapon and stabbed an officer, it became necessary to use additional force to restrain Plaintiff, deter additional attacks, and disarm Plaintiff. The video is entirely consistent with the officer statements. Once Plaintiff was subdued and restrained, no further force was used. Later videos show officers calmly escorting Plaintiff away from the hallway.

The videos show that Plaintiff's assertion that there is a period of over one minute when he was not on camera, is not true. The image upon which Plaintiff relies is an unrelated image captured on February 17, 2017, approximately two weeks before the incident, does not apply to the instant incident which began at approximately 14:45 hours on March 3, 2017.

**(5)      Evidence**[1]

**(A)      Declaration of Janet L. Brown** (Doc. No. 33-1)

Brown was Correctional Sergeant III at Lanesboro on March 3, 2017. At approximately 2:45 PM, Brown responded to a call for assistance in the Anson Unit. When Brown arrived, Plaintiff was arguing with McFaulds. Plaintiff was not restrained but Brown saw the restraints

---

[1] This section is not exhaustive. The Court takes judicial notice of the relevant portions of the NCDPS Policy & Procedure and Lanesboro SOPs. See Fed. R. Ev. 201.

around his right wrist and she saw Plaintiff's right hand in his pocket.

Plaintiff was telling McFaulcs that "they tore up his room" and he was not going into his cell until something was done. (Doc. No. 33-1 at 1). Plaintiff was refusing to submit to restraints. McFaulds told Plaintiff that "we are not going to deal with it" and Plaintiff said if they wanted some "smoke," he was going to take one of them with him. (Doc. No. 33-1 at 1-2). Brown called Code 4 and staff responded. OC pepper spray was administered and Hinson attempted to restrain Plaintiff. Another inmate yelled that Plaintiff had a homemade weapon capable of producing serious bodily injury.

Brown observed Hinson on the floor with blood on his head and assisted him out of the way and called a Code Blue. By the time Brown had assisted Hinson out of the area, staff had restrained Plaintiff. A homemade weapon, approximately 8" long, metal, with a sharpened tip, was on the floor with blood on it. Brown secured the scene until law enforcement arrived.

Based on Brown's experience and training, "the use of force employed by [Brown] and others was necessary to achieve a correctional goal and was not excessive." (Doc. No. 33-1 at 2).

### (B)     <u>**Declaration of Phillip Dimato**</u> (Doc. No. 33-2)

Defendant Dimato was a Correctional Officer at Lanesboro on March 3, 2017. At approximately 2:50 pm, Dimato responded to a Code 4 call for assistance in Anson. Upon arriving, he observed Plaintiff standing in the hallway surrounded by several staff members refusing to be placed in restraints. After several orders were given to be restrained, staff attempted to gain control of Plaintiff, at which time he produced a homemade weapon. After striking Hinson several times, Plaintiff was placed on the floor to attempt to gain control and place him in restraints. Plaintiff continued his assault, striking Hinson several more times. Dimato "attempted to strike [Plaintiff's] arm with [his] baton, but due to the amount of staff involved [Dimato] was unsuccessful." (Doc.

No. 33-2 at 2)

Dimato observed Plaintiff's hand containing the weapon at which time Dimato placed his foot on the weapon and slid it away from Plaintiff and against the wall to secure it.

Once Plaintiff ceased his combative resistance, and was placed in restraints, Dimato assisted by walking, with additional staff, to place Plaintiff in the holding cell in the mental health office until he could be screened by medical.

Based on Dimato's experience and training, "the use of force employed by [Dimato] and others was necessary to achieve a correctional goal and was not excessive." (Doc. No. 33-2 at 2).

**(C)** **Declaration of Andrew Estridge** (Doc. No. 33-3)

Estridge was a Correctional Case Manager at Lanesboro on March 3, 2017. At approximately 2:50 PM, he responded to a Code 4 call for assistance on Anson. When he arrived, Plaintiff was on the ground with staff trying to place restraints on him. McFaulds was at Plaintiff's feet, trying to control them.

Estridge received leg restraints from another officer and placed them in Plaintiff's ankles and secured his feet until other officers brought Plaintiff to his fee.

Based on Estridge's experience and training, "the use of force employed by [Estridge] and others was necessary to achieve a correctional goal and was not excessive." (Doc. No. 33-3 at 1).

**(D)** **Declaration of Steven Harrington** (Doc. No. 33-4)

Harrington was Correctional Officer III and was assigned to Anson Unit for shift duty on March 3, 2017. At approximately 2:45, there was a call for assistance over the radio. Assistance was needed in G Pod as an inmate was rushing out of the Pod without being restrained. Plaintiff came out of G Pod back out to the Anson hallway complaining about his property being destroyed because the pod was flooded by other inmates.

Harrington and other staff tried to calm Plaintiff down while remaining cautions because Plaintiff kept his right hand in his pocket and refused to be restrained. Around that time, the Assistant Unit Manager called a Code 4 on the Unit.

Plaintiff was holding a shank when officers began using force. They gained control of the weapon and Plaintiff was finally put in restraints.

Based on Harrington's experience and training, "the use of force employed by [Harrington] and others was necessary to achieve a correctional goal and was not excessive." (Doc. No. 33-4 at 2)

### (E) <u>Declaration of Justin Honbarrier</u> (Doc. No. 33-5)

Defendant Honbarrier was a Correctional Officer II at Lanesboro on March 3, 2017. At approximately 2:45 PM, Honbarrier responded to a Code 4 call for assistance on Anson. Honbarrier witnessed Plaintiff arguing with staff and refusing to submit to hand restraints. Plaintiff had both of his hands in his pockets.

When Hinson attempted to restrain Plaintiff, Plaintiff pulled a homemade weapon out of his pocket with his right hand and struck Hinson with it several times in the head and back area. Plaintiff was placed on the floor and he refused to drop the weapon.

Honbarrier struck Plaintiff in the right arm with a closed baton in order to get Plaintiff to drop the weapon and comply with orders. Once the weapon was removed, Honbarrier assisted with placing a full set of restraints on Plaintiff.

After the restraints were placed on Plaintiff, Honbarrier assisted with escorting Plaintiff to interview room S-4, the "Mental Health Room," which contains a holding cell so mental health providers can interview dangerous inmates who are in a holding cell. (Doc. No. 33-5 at 2). Honbarrier helped place Plaintiff in the holding cell without incident. At no time did Honbarrier

engage in any physical altercation with Plaintiff after he was fully restrained.

Based on Honbarrier's experience and training, "the use of force employed by [Honbarrier] and others was necessary to achieve a correctional goal and was not excessive." (Doc. No. 33-5 at 2).

**(F)    Declaration of Kearry Hinson** (Doc. No. 33-6)

Defendant Kearry Hinson was Correctional Officer II at Lanesboro on March 3, 2017. (Doc. No. 33-6 at 1). Defendant Hinson responded to Anson after a Code 4 was called at approximately 2:51 PM.

Plaintiff was standing out of restraints, being combative and threatening staff. When Plaintiff did not obey orders and submit to restraints, OC spray then hands-on force was used to gain control. At that time, Defendant Hinson placed both hands on Plaintiff's left wrist. After Plaintiff and other staff went to the ground, Defendant Hinson saw Plaintiff use a metal object to stab at staff, striking the top of the head of at least one of the officers. Once the officers got the weapon out of Plaintiff's hands, Plaintiff was fully restrained.

Defendant Hinson escorted Plaintiff away from the hallway to the Mental Health room, which is a room off the hallway with a desk and holding cell. They put Plaintiff in the holding cell in that room so he could cool down and be strip searched for additional weapons, then taken to medical for evaluation and treatment.

Defendant Hinson did not perform a strip search. Defendant Hinson was one of the last, if not the last officer to leave the MHR after Plaintiff was secured in the holding cell.

At no time did Defendant Hinson or anyone else accompanying Plaintiff to the holding cell in the MHR place him on the ground. Hinson did not kick or beat Plaintiff after he was restrained. Hinson did not witness any other correctional officers kicking or beating Plaintiff after he was

restrained.

Based on Defendant Hinson's experience and training, "the use of force employed by [Defendant K. Hinson] and others was necessary to achieve a correctional goal and was not excessive." (Doc. No. 33-6 at 2).

**(G)** **Declaration of Michael Hinson** (Doc. No. 33-7)

Michael Hinson was a Correctional Officer at Lanesboro on March 3, 2017. M. Hinson responded to a Code 4 call for assistance on 3/3/17 at approximately 2:50 PM and observed Plaintiff refusing to submit to cuffs. Plaintiff was standing with a handcuff on his right wrist. Plaintiff appeared to be a threat with his left hand in his pocket, and it alarmed M. Hinson that Plaintiff could possibly pull a weapon on staff.

M. Hinson made a move to restrain Plaintiff. After M. Hinson grabbed Plaintiff, they went to the floor.

After help providing assistance, M. Hinson was pulled from the altercation. At this time, M. Hinson realized he had been injured by Plaintiff who had a homemade weapon in his pocket. M. Hinson was taken to medical for assessment.

Based on M. Hinson's experience and training, "the use of force employed by [M. Hinson] and others was necessary to achieve a correctional goal and was not excessive." (Doc. No. 33-7 at 2).

**(H)** **Declaration of Michael Kiker** (Doc. No. 33-8)

Kiker was a Correctional Officer II at Lanesboro on March 3, 2017. Kiker responded to a Code 4 at approximately 2:45 PM. As staff attempted to take control of Plaintiff, Kiker noticed that Plaintiff produced a homemade weapon that could cause serious injury. Kiker announced "shank" so staff would know there was a weapon involved. (Doc. No. 33-8 at 1). Kiker took control

of Plaintiff's left leg until he was restrained.

Based on Kiker's experience and training, "the use of force employed by [Kiker] and others was necessary to achieve a correctional goal and was not excessive." (Doc. No. 33-8 at 1).

**(I)** <u>**Declaration of Jeffrey Krantz**</u> (Doc. No. 33-9)

Krantz was a Correctional Sergeant II at Lanesboro on March 3, 2017. Krantz responded to a call for assistance at approximately 2:45 PM. As Krantz entered the Unit through the C37B slider, unit staff told Krantz and additional responding staff to slow down and stop. Krantz observed Plaintiff standing in the hallway with his right hand in his pocket and his left hand free from his restraints. Unit staff attempted to talk Plaintiff down while additional staff continued to respond. Unit staff continued to attempt to talk Plaintiff down when Captain Aaron walked into the unit and said "spray him hand cuff him up." (Doc. No. 33-9 at 2). Hinson attempted to control Plaintiff's right arm due to the suspicion of a weapon. Plaintiff grabbed Hinson by the head and Krantz placed his right hand on Plaintiff's right wrist. Krantz witnessed Plaintiff holding a homemade weapon in his right hand. Krantz placed both his hands around Plaintiff's right wrist to stop further assault on staff and called out "shank!" to alert staff of the weapon. (Doc. No. 33-9 at 2). Additional staff controlled his right hand but Plaintiff refused to drop the weapon.

Krantz delivered "four hammer fist strikes to [Plaintiff's] right wrist to attempt to free the weapon from his hand." (Doc. No. 33-9 at 2). Plaintiff was able to turn away, so Krantz continued to assist staff by controlling Plaintiff's upper left torso. Plaintiff was able to turn onto his back, making an attempt to stop staff from placing him in restraints.

The weapon was removed from Plaintiff's hand and Krantz placed his left hand on Plaintiff's right should and his right hand on top of Plaintiff's right him and rolled him into a position that allowed staff to restrain him. (Doc. No. 33-9 at 2).

Once Plaintiff was restrained, Krantz removed himself from the area, allowing additional staff to escort him away from the scene. Plaintiff was taken to be assessed by medical while remaining staff secured the scene.

Based on Krantz's experience and training, "the use of force employed by [Krantz] and others was necessary to achieve a correctional goal and was not excessive." (Doc. No. 33-9 at 2).

**(J)  Declaration of Darrell Mullis** (Doc. No. 34)

Mullis was a Correctional Lieutenant III at Lanesboro on March 3, 2017, and is now retired. Mullis' job duties involved assisting in planning, supervising, and coordinating activities at Lanesboro, and was responsible for serving as a shift supervisor. At the time, was familiar with NCDPS Use of Force Policy & Procedures and Lanesboro's Use of Force SOP.

Plaintiff is serving a 24 year, 10 month sentence for first-degree murder (conspiracy). He was convicted on April 4, 2014. Between April 4, 2014 and March 3, 2017, Plaintiff committed 22 disciplinary infractions including disobeying orders, threatening to harm staff, involvement with a gang and assaulting staff with a weapon.

The incident began at approximately 2:45 PM. Prior to the use of force, Plaintiff slipped one hand from the handcuffs, pushed an officer, and ran into the Anson hallway. A number of correctional officers attempted to defuse the situation and get Plaintiff to submit to restraints. He repeatedly refused their orders such that use of force was ultimately required.

During the use of force incident, Plaintiff pulled a homemade knife from his pocket and stabbed two officers. He was finally subdued, restrained, and escorted to medical for evaluation and treatment.

Use of Force Policy & Procedure requires a written report to be prepared following all uses of force. Lanesboro SOP reporting procedure for use of force incidents largely mirrors the Policy

& Procedure.

Mullis was assigned to investigate the incident. He took a number of witness statements, reviewed the video of the incident, and took pictures of the injures of the correctional officers and Plaintiff. Video footage is consistent with all the statements Mullis received. It demonstrates that Plaintiff had one hand free from handcuffs, that the officers gave him plenty of opportunities to stand down, that pepper spray was initially used, and that after Plaintiff pulled a knife out of his pocket, additional force became necessary to avoid further injury to staff and to get Plaintiff to release the knife.

Mullis determined that the use of force was "necessary and reasonable." (Doc. No. 34 at 4). It was consistent with § .1503 of the Use of Force P&P and § 21 of the Use of Force SOP.

Mullis determined that all use of force against Plaintiff by all personnel involved, including Honbarrier, Simmons, Kearry Hinson, and Dimato was in accordance with Policy & Procedure and SOP, and found no evidence that Plaintiff was subjected to an excessive use of force by any NCDPS personnel including Honbarrier, Simmons, Kearry Hinson, and Dimato. Based on experience, training, and investigatory findings, Mullis does not believe that Plaintiff was subjected to any excessive force on March 3, 2017. Honbarrier, Simmons, Kearry Hinson, and Dimato were acting within the scope and course of their employment and training as investigatory staff. The appropriate amount of force was used to obtain corrective objective.

In all the statements Mullis obtained and all the investigation he conducted, there was no indication whatsoever that Honbarrier and Hinson took Plaintiff into a room, put him on the floor and kicked and beat him. There was no indication whatsoever that they used any force other than an escort touch after Plaintiff was restrained in the hallway.

As a result of the incident, Plaintiff was charged and found guilty of A-03 assaulting and

injuring staff; A-06 attempted escape; B-01 possessing a weapon. <u>See</u> (Doc. No. 33-16 at 1).

**(K)**      **Declaration of Brett Simmons** (Doc. No. 33-17)

Defendant Simmons was a Correctional Sergeant at Lanesboro on March 3, 2017. Defendant Simmons responded to call for assistance at approximately 2:45 PM. Defendant Simmons saw Plaintiff standing in the hallway unrestrained. Plaintiff had his right hand in his pocked but could see that he had a hand restraint around his right wrist. Plaintiff was refusing restraints and stated "If you want smoke you got it" and that he was going to take one of the officers with him. (Doc. No. 33-17 at 1). A Code 4, generalized call for all staff to respond to inmate violence, was called and additional staff arrived to assist.

Captain Aaron, the OIC of that shift, arrived with the other staff. He ordered the staff to spray Plaintiff with pepper spray and restrain him. Snipes administered pepper spray. Hinson and others approached Plaintiff to attempt to subdue and restrain Plaintiff. Plaintiff then pulled a homemade weapon from his pocket and stabbed Hinson in the neck and back.

Plaintiff was taken to the ground but still refused to release the weapon and submit to restraints. Because Plaintiff refused to release the weapon, which he had already used to injure a correctional officer, Simmons felt it was necessary to use force. He delivered "several strikes with an unexpanded baton to [Plaintiff's] chest, hands and shoulders to get him to release the weapon." (Doc. No. 33-17 at 2). Once the weapon was removed from his hand, Plaintiff was put in full restraints and escorted off the unit for medical assessment.

Based on Simmons' experience and training, "the use of force employed by [Simmons] and others was necessary to achieve a correctional goal and was not excessive." (Doc. No. 33-17 at 2).

**(L)**      **Declaration of Anthony Snipes** (Doc. No. 33-18)

Snipes was a Correctional Officer II at Lanesboro on March 3, 2017. At approximately 2:51 PM, Snipes responded to a Code 4 call for assistance in Anson. When Snipes arrived, responding staff were told to stop by Assistant Unit Manager and Unit staff while they were talking to Plaintiff who was out of hand restraints.

Once the OIC arrived, Plaintiff was given several direct orders to submit to restraints but he refused. Due to Plaintiff not complying, Snipes then administered one half-second burst of OC pepper spray to Plaintiff's facial area. Staff then attempted to gain control of Plaintiff but he began punching staff. Plaintiff was eventually taken to the ground where he pulled out a homemade weapon that was metal and could produce serious bodily harm or injury. Plaintiff began stabbing staff several times and Snipes was stabbed in the head and hit in the back of the head/neck area. Staff was able to get the homemade weapon from Plaintiff but he still refused to comply and continued assaulting staff. Snipes attempted to strike the brachial plexus region, which is a CRDT-approved technique to prevent further assault on staff. Plaintiff was eventually placed back in hand restraints. Snipes was taken and seen by medical staff and was sent to outside medical.

Based on Snipes' experience and training, "the use of force employed by [Snipes] and others was necessary to achieve a correctional goal and was not excessive." (Doc. No. 33-18 at 2).

**(M)** **Declaration of Sandra Webster** (Doc. No. 33-19)

Webster was a Correctional Officer at Lanesboro on March 3, 2017. At approximately 2:45 PM, Webster was using soft hand escort on Plaintiff to escort him from the outside recreation cage to his assigned cell in Anson. He was handcuffed with his hands behind his back.

When they reached Plaintiff's cell, Webster opened the cell door and the floor was wet from another inmate flooding the cell. Plaintiff refused to enter the cell. He slipped his left hand out of the cuff, pushed Webster out of the way, and ran out of G pod into the central hallway.

Webster called for assistance over the radio. Webster did not take active part in the events in the hallway.

**(N)** **Medical Records**

3/3/17      <u>Clinical Encounter – Administrative Note</u> by Dena West, RN: "Inmate to main medical to have lacerations sutured by the unit provider. Sent to local ER for x-rays" of left hand, left wrist, left jaw (Doc. No. 43 at 99)

     <u>Atrium Health ER Documentation</u>: "The patient presents to the emergency department and reports being assaulted… Patient is presently incarcerated, sustained physical assault today by guards after he attacked 2 guards with a 'shank'. States that he was struck with multiple objects and was evaluated by the nurses prior to hospital transfer. He had 4 lacerations that were repaired on his scalp and had his tetanus updated. He is complaining of left jaw pain, left forearm, wrist, hand pain and swelling. Denies loss of consciousness, neck pain…;" Associated Diagnoses: "Fracture of ramus of left mandible, initial encounter for closed fracture; Multiple abrasions, Stab wound of left forearm; Contusion of hand, left;" discharged on 3/4/17 (Doc. No. 43 at 117)

3/4/17      <u>Clinical Encounter – Administrative Note</u> by Erika Whitted, RN: "Inmate Presents to CPUC from Lanesboro for medical treatment of fractured jaw … Multiple wounds to head, face, and arms. Four open areas to top of head, 4 sutures to each wound…." (Doc. No. 43 at 97)

3/9/17      <u>Clinical Encounter – Administrative Note</u> by David Bunn, RN: "Pt being held in 23 hr r/t fx jaw awaiting apt with UNC oral surgery… Pt also has sutures to head" (Doc. No. 43 at 61)

3/10/17      <u>Dental Encounter – Administrative Note</u> by Michael O'Brien, dentist: for clinical consult, "I got hit in the face last week," exam reveals jaw fracture, referral to Dr. Blakey at UNC (Doc. No. 43 at 101)

3/13/17      <u>Clinical Encounter – Administrative Note</u> by Shahzad Ahmed, MD: "s/p left mandible fracture on 3-3-17, awaiting evaluation by Maxillo facial surgeon;" ibuprofen is not enough for pain; will give him narco for a few days (Doc. No. 43 at 60)

     <u>Clinical Encounter – Administrative Note</u> by Erika Whitted, RN: Inmate awaiting appointment for jaw fracture; multiple scalp wounds repaired with 16 sutures 10 days ago, sutures removed (Doc. No. 43 at 59)

3/17/17      <u>UNC Health Care discharge summary</u> Oral and Maxillofacial Surgery Outpatient Clinic Note; referred from Central Prison for mandible fracture; "left mandibular angle fracture involving impacted tooth;" "Patient will be taken to the OR for ORIF

of mandible fracture with extraction of tooth #17; "Patient reports being kicked in the left jaw once. No loss of consciousness." (Doc. No. 43 at 103)

3/20/17    <u>Clinical Encounter – Administrative Note</u> by Megan Sessoms, RN: Plaintiff had procedure today; wisdom tooth pulled along with metal placed for broken jaw (Doc. No. 43 at 65)

### III.    LEGAL STANDARDS

**(1)    <u>Summary Judgment</u>**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. <u>Id.</u> at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Sylvia Dev. Corp. v. Calvert County, Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. <u>Anderson</u>, 477

U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009) (quoting <u>Matsushita v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

**(2)    Excessive Force**

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment," <u>Helling v. McKinney</u>, 509 U.S. 25, 31 (1993). In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners. <u>See</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 1 (1992).

A prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious," <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991); <u>see</u> <u>also</u> <u>Hudson</u>, 503 U.S. at 5, and must result in the denial of "the minimal civilized measure of life's necessities," <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981). The second requirement is that a prison official must have a "sufficiently culpable state of mind." <u>Wilson</u>, 501 U.S. at 297, 302-03; <u>Hudson</u>, 503 U.S. at 5, 8. "[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." <u>Hudson</u>, 503 U.S. 1, 4 (1992); <u>see</u> <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 34 (2010). The "core judicial inquiry," is not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson</u>, 503 U.S. at 7. "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated ... whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting

less than some arbitrary quantity of injury." <u>Hudson</u>, 503 U.S. at 9, 13–14.

**(3)** **Qualified Immunity**

      The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. <u>Am. Civil Libs. Union of Md., Inc. v. Wicomico Cnty., Md.</u>, 999 F.2d 780, 784 (4th Cir. 1993) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

      In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in <u>Saucier</u> is "often appropriate," it is not mandatory. <u>Pearson</u>, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. <u>Id.</u>

      To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue

must have been "clearly established" at the time of the defendant's alleged misconduct. <u>Thompson v. Commonweath of Va.</u>, 878 F.3d 89, 97 (4th Cir. 2017) (citing <u>Pearson</u>, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson</u>, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." <u>Amaechi v. West</u>, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." <u>Id.</u> at 362-63 (internal quotation omitted). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. <u>White v. Pauly</u>, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (citing <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." <u>Id.</u> at 741.

## IV.    DISCUSSION

Defendants argue in their Motion for Summary Judgment that Defendants used justifiable and reasonable force during the incident in the hallway and that Plaintiff cannot forecast evidence that Plaintiff was beaten after the incident in the hallway occurred. Plaintiff has submitted his own verified statement alleging that Defendants used excessive force while he was on the ground in the hallway by beating him with batons causing lacerations to his scalp and that he was beaten again

after he was fully restrained and escorted out of the hallway, which broke his jaw. Plaintiff has submitted medical records showing that he sustained four scalp lacerations requiring 16 stitches and that he also sustained a broken jaw requiring surgery. Defendants have submitted evidence including sworn statements from several correctional officers and video surveillance footage before, during, and after the incident in the hallway. Statements from Defendants and Plaintiff are contradictory in several respects. The video surveillance footage shows Plaintiff slip a handcuff and run from a female officer, then stand in a hallway apparently conversing with several officers. One officer charged Plaintiff and took him to the ground. The other officers then mass around until Plaintiff is brought to his feet and escorted away and does reveal the parties' relative positions and actions with certainty. After Plaintiff is restrained and escorted through a hallway to another room, the footage does not continue into that room.

Genuine disputes of material fact exist with regards to each of the parties' actions and the timing and reasonableness of Defendants' uses of force. In light of the disputed facts with regards to use of excessive force, the Court is unable to determine at this juncture whether Defendants are entitled to qualified immunity or if Plaintiff may be able to recover punitive damages. Therefore, Defendants' Motion for Summary Judgment will be denied and this case will be set for trial.

## IV. PENDING MOTION

Plaintiff has filed a Motion for Appointment of Counsel, (Doc. No. 42). He argues that he is unable to afford counsel, his imprisonment will greatly limit his ability to litigate, that the issues in this case are complex and will require significant research and investigation, and Plaintiff has limited access to the law library and limited knowledge of the law.

There is no absolute right to the appointment of counsel in civil actions such as this one. Therefore, a plaintiff must present "exceptional circumstances" in order to require the Court to

seek the assistance of a private attorney for a plaintiff who is unable to afford counsel.  Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987).

Plaintiff has failed to demonstrate the existence of exceptional circumstances warranting the appointment of counsel and Plaintiff's Motion will be denied. However, the Court will attempt to locate volunteer counsel to assist Plaintiff at trial.

## V.     CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is denied, Plaintiff's Motion for Appointment of Counsel will be denied, and the case will proceed to trial on Plaintiff's claims of excessive force.

**IT IS, THEREFORE, ORDERED** that:

1.  Defendants' Motion for Summary Judgment, (Doc. No. 31), is **DENIED**.

2.  Plaintiff's Motion for Appointment of Counsel, (Doc. No. 42), is **DENIED**.

3.  This case will be set for trial in a separate order.

Signed: January 22, 2020

Frank D. Whitney
Chief United States District Judge